# IN THE COURT OF APPEALS OF IOWA

No. 16-2221
Filed April 18, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DAVID PAUL DOUGLASS,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

David Douglass appeals his conviction for assault with the intent to commit sexual abuse. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Brenda J. Gohr, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kelli A. Huser, Assistant Attorney General, for appellee.

Considered by Vogel, P.J., Mullins, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**MAHAN, Senior Judge.**

David Douglass appeals his conviction for assault with the intent to commit sexual abuse, contending his trial counsel was ineffective in failing to move to suppress the eyewitness identification from the victim's neighbor. We affirm.

**I.      *Background Facts and Proceedings***

During the summer of 2016, J.B. joined her church softball league. A week before the season started, J.B. met Douglass at a softball meeting. On May 19, Douglass asked J.B. if she would substitute for his team later that day. J.B. was exhausted from her day and wanted to take a nap before the game, but she knew Douglass lived nearby so she told him, "My window will be open, holler at me and get me up." J.B. is eighty-seven percent deaf in both ears, but her bedroom was on the ground floor and she knew Douglass had "a loud enough voice that [she] would have heard him yell at [her] to wake [her] up."

J.B.'s neighbor, Tommy Mayse, had a "good view" of the back of J.B.'s house. Mayse saw a person he did not recognize enter the back door of J.B.'s home that evening. Mayse later identified Douglass as that person from a photo line-up and at trial.

J.B. woke up to "the feeling of a hand tapping on [her] shoulder." She saw Douglass sitting on the end of her bed. "[H]is hand was in between [her] breasts in [her] cleavage area and he was groping [her]." J.B. tried to get out of bed, but Douglass "stood in front of [her] and started groping [her] in between [her] legs." He pushed her back onto the bed and tried to touch her again.

J.B.'s dog was barking, and she tried to get to the kitchen to let the dog out. Douglass was "behind [J.B.] hovering over [her]" with "his hands . . . inside [her]

shirt on [her] breasts." Douglass again "grop[ed J.B.] in between [her] legs and would not stop." During the encounter, Douglass made remarks that led J.B. to believe he wanted or expected a sexual relationship. J.B. was scared, angry, and threatened by Douglass.

J.B. was able to push Douglass through the back door, put her dog outside, and shut the door. Early the next day, Douglass sent J.B. a text message asking if she was mad at him. After J.B. responded, Douglass said he was "100% sorry," he "felt more than terrible," and he "kn[ew] that sorry isn't enough to fix the damage."

The State charged Douglass with one count of burglary in the second degree and one count of sexual abuse in the third degree with an enhancement.[1] At trial, J.B. and Mayse testified as eyewitnesses. At the close of the State's case, defense counsel moved for judgment of acquittal on both counts. The district court granted the motion as to the charged offenses, finding there was insufficient evidence of the element of a "sex act" required for both counts, but the court found sufficient evidence to allow the jury to consider the lesser-included offenses on each count.

For the defense, Douglass's softball teammate, Duane Foster, testified he was with Douglass in the early afternoon on May 19 and then again after the softball game. According to Foster, Douglass received a phone call from J.B. during the afternoon. Douglass's girlfriend, Debra Gardner, testified Douglass had

---

[1] The State originally charged Douglass with one count of burglary in the first degree and one count of sexual abuse in the third degree but amended the trial information prior to trial.

been with her all day except for a few hours when he was with Foster during the afternoon.

The jury acquitted Douglass of the burglary count but found Douglass guilty of assault with intent to commit sexual abuse. Douglass appeals.

## II. *Standard of Review*

Douglass challenges his counsel's failure to move to suppress the eyewitness identification by Mayse. To prevail, Douglass must show (1) counsel breached an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We review ineffective-assistance claims de novo. *Dempsey v. State*, 860 N.W.2d 860, 868 (Iowa 2015).

## III. *Ineffective Assistance of Counsel*

Counsel does not breach an essential duty in declining to pursue a meritless issue. *State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015). To address Douglass's contention, we begin by considering whether a motion to suppress Mayse's identification would have been meritless.

Douglass claims the photo-array identification procedure used to identify him as a suspect violated his due process rights under the Iowa Constitution.[2]

---

[2] Douglass urges us to adopt a new approach to evaluate identification procedures, as set forth by the New Jersey Supreme Court. *See State v. Henderson*, 27 A.3d 872, 890-91 (N.J. 2011) (articulating additional factors to consider when determining the reliability of identification). The State counters that trial counsel was not ineffective in failing to raise a novel issue, considering "Iowa courts have followed the existing test since the early 1970s" and Douglass did not show "a well-developed movement in other states to abandon the federal law." *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) (setting forth the two-step test, which has been adopted by Iowa courts); *State v. Folkerts*, 703 N.W.2d 761, 763-64 (Iowa 2005) (applying the *Biggers* analysis); *State v. Salazar*, 213 N.W.2d 490, 493-94 (Iowa 1973) (citing to *Biggers*). We agree. *See State v. Westeen*, 591 N.W.2d 203, 210 (Iowa 1999) (holding counsel was not required to raise an issue that a competent attorney would have concluded was not worth raising). We further note we are not at liberty to overturn Iowa Supreme Court precedent, *see State v. Miller*, 841 N.W.2d

Determining whether pretrial identification procedures violate the Due Process Clause requires a two-step analysis:

> First, we decide whether the procedure used for the identification was impermissibly suggestive. If we find that it was, we must then decide whether "under the totality of [the] circumstances the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification." The critical question under the second step is whether the identification was reliable.
> . . . .
> On the question of reliability, we give weight to five factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*State v. Taft*, 506 N.W.2d 757, 762-63 (Iowa 1993) (alteration in original) (citations omitted).

It is Douglass's burden to establish the photo array was impermissibly suggestive and the identification was unreliable. *See State v. Neal*, 353 N.W.2d 83, 86 (Iowa 1984) ("To succeed on this claim, defendant must establish that the procedures were suggestive and the irregularities gave rise to a substantial likelihood of irreparable misidentification in the totality of the circumstances."). If Douglass fails to meet his burden, "the identification evidence and its shortcomings or credibility are for the jury to weigh." *Id.* at 97. "When unnecessarily suggestive pretrial out-of-court identification procedures conducive to mistaken identification that are incapable of repair are used, the Due Process Clause requires exclusion of the testimony of the identification." *Folkerts*, 703 N.W.2d at 763.

---

583, 584 n.1 (Iowa 2014) ("Generally, it is the role of the supreme court to decide if case precedent should no longer be followed."); we decline to consider the merits of Douglass's arguments regarding a new approach to Iowa law.

Douglass points to the following as support for his contention that the identification procedures were impermissibly suggestive: (1) the five "filler" photographs depict individuals wearing orange prison shirts whereas Douglass is wearing a green prison shirt, "causing him to stand out"; (2) the detective who created the photo array had never done one before; (3) the police "failed to follow a blind administration of the line-up"; and (4) the police "failed to give a pre-identification instruction."[3]  The following facts are relevant to his claim.

Mayse lived next door to J.B., and he testified he had a "good view" of the back of J.B.'s house.  Mayse was cleaning his garage between approximately 5:00 and 6:00 p.m. on May 19, when he saw a person he did not recognize enter the back door of J.B.'s home.  Mayse saw the "front and then side" of the person. Several days later, the police spoke to Mayse about what he saw.  Mayse was shown an array of six photographs; he identified Douglass's picture as the person he saw at J.B.'s home on May 19.  Mayse also identified Douglass at trial.

Defense counsel questioned Mayse about the shirt colors worn by the people in the six photographs; Mayse acknowledged all the people in the pictures were "wearing orange except for one wearing green"—Douglass.  The prosecutor then asked Mayse the following questions:

> Q. And did you pick him out of that photo lineup because he was in green and everybody else was in orange?[4]  A. No.
> Q. Why did you pick him out of the photo lineup?  A. That's the person I saw.

---

[3] The officer was not asked whether Mayse was given a pre-identification instruction. Because we cannot affirmatively determine whether such instruction was given, Mayse has not sustained his burden to prove this part of his claim.

[4] We acknowledge, based on our review of the photo array, that very little of the prison suit is visible in Douglass's photo.

The officer testified that the photo array was the "first one" he had done, but he was "shown by a senior detective" how "to generate the lineup." The officer stated he was trying to "make sure that the lineup [was] not suggestive in any way to a witness" and that if an identification was made "it [was] done by their own accord and not by any suggestions [he] may have made or that the photo lineup may have made."

Under these facts and circumstances, we conclude defense counsel did not breach an essential duty in declining to move to suppress Mayse's identification. Although we agree with Douglass that the color of his shirt in his photo accentuates that photo relative to the shirt colors of the men in the other five pictures, this fact alone does not render the array impermissibly suggestive. *See Neal*, 353 N.W.2d at 88-89 (noting that even "startling differences" may not satisfy "suggestiveness" standard and that "characteristics of a photo such as a darker background or greater or sharper contrast are of no consequence in a suggestiveness claim"); *State v. Nagel*, 458 N.W.2d 10, 13 (Iowa Ct. App. 1990) (rejecting a claim of suggestiveness based on distinctive physical characteristics of the defendant). Moreover, Mayse's testimony that his identification was not based on the shirt color, but rather because it was "the person [he] saw" is significant. We also cannot find, based on these facts, that the procedure used was impermissibly suggestive. The officer was assisted in creating the photo array by a senior investigator and selected five pictures of individuals who looked similar to Douglass.[5] *See State v. Rawlings*, 402 N.W.2d 406, 408 (Iowa 1987) (noting an

---

[5] Douglass does not challenge the physical characteristics of the other photos.

officer's "reasonable effort to harmonize" the photo array "is normally all that is required").

Douglass has also not shown he was prejudiced by counsel's alleged breach. To prove prejudice, Douglass "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687. In making this determination, we consider the evidence as a whole as well as the extent of the effect of counsel's purported error on the overall trial. *See State v. Graves*, 668 N.W.2d 860, 882-83 (Iowa 2003).

Here, the jury considered testimony from J.B. identifying Douglass as her attacker. J.B. knew Douglass from her softball league, and she identified him in court. Douglass sent J.B. text messages after the attack asking if she was mad at him and apologizing. Mayse identified Douglass in court and testified he was the person who entered J.B.'s home that day. Douglass's alibi evidence left several hours of his afternoon unaccounted for. Even if the identification evidence had been suppressed, there is no reasonable probability of a different verdict. *See State v. Morgan*, 877 N.W.2d 133, 136 (Iowa Ct. App. 2016) (noting a claim of ineffective assistance of counsel fails if either prong is not proved).

Upon consideration of the ineffectiveness issue raised on appeal, we affirm Douglass's conviction for assault with the intent to commit sexual abuse.

**AFFIRMED.**